

FILED
2017 Feb-03  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PETER J. FERRARI, | ) | |
| Plaintiff, | ) | |
| vs. | ) | 2:14-cv-01941-LSC |
| D.R. HORTON, INC.-BIRMINGHAM, | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

Before the Court is Defendant D.R. Horton, Inc.-Birmingham's ("Horton's") Motion for Partial Summary Judgment[1] (Doc. 162), as well as Plaintiff Peter J. Ferrari's ("Ferrari's") Motion for Summary Judgment (Doc. 172). Also before the Court are Horton's two Motions to Strike. (Docs. 188 and 190.) Ferrari brought this action asserting retaliation under 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and Alabama state common law claims for (1) negligent/wanton hiring, training, supervision and/or retention, (2) invasion of privacy and (3) intentional infliction of emotional distress/outrage. Horton filed counterclaims for Alabama state common law breach of fiduciary duty and duty of loyalty, intentional

---

[1] Horton moves for summary judgment on all Plaintiff's claims and for partial summary judgment on its own counterclaims.

interference with prospective economic advantage, unjust enrichment, and faithless servant liability. Horton also filed claims under Alabama statutes for fraud by misrepresentation of material facts under Ala. Code § 6-5-101, fraud through suppression of material facts under Ala. Code § 6-5-102, violations of the Alabama Trade Secrets Act ("ATSA"), and fraudulent deceit under Ala. Code § 6-5-104. For the reasons stated below, Ferrari's Motion for Summary Judgment is due to be denied. Horton's Motion for Summary Judgment is due to be denied in part and granted in part. Horton's Motions to Strike are due to be denied as moot.

I.   BACKGROUND

Ferrari was employed by Horton, a company in the business of home building, as a land acquisition manager in charge of obtaining the best deals and terms for land purchases that he could for Horton. (Ferrari Dep. at 40-1, Whitehurst Dep. at 72.) He was neither an officer nor a director and did not have the power to bind the company to any contract—all land purchases had to be approved by Horton management in Texas. (Whitehurst Dep. at 72, 102-03.) All land purchase contracts also had due-diligence provisions that allowed Horton to cancel the deals for any reason up until the time of closing. (*Id.* at 103, 127.) Horton sometimes

used this provision to "retrade" transactions, or threaten to walk away from a deal unless the price was renegotiated. (*Id.* at 158-59.)

While working for Horton, Ferrari also did the same kind of work for D.R. Horton, Inc. ("DHI"), a separate entity. (Whitehurst Dep. at 310-12, Gill Dep. at 115.) Horton does not operate in Florida, and DHI does not operate in Alabama. (Whitehurst Dep. at 26.) Horton paid Ferrari for his work with both Horton and DHI. (Whitehurst Dep. at 310-12.) According to Scott Whitehurst ("Whitehurst"), Ferrari's supervisor at Horton, this compensation was "allocat[ed]" between Horton and DHI internally. (*Id.*)

A. Alleged Conflicts of Interest

On November 9, 2009, Ferrari received and signed Horton's Employee Personnel Policy Guidelines ("the handbook"), which among other things, defined prohibited conflicts of interest. (Ferrari Dep. at 173-75, Ex. 20.) The handbook specifically stated:

> Employees and their immediate families are not to solicit, accept or retain a personal benefit from any . . . individual or organization doing or seeking to do business with the Company, or from any other individual or organization.  In this context, a personal benefit is regarded as any type of discount for services performed, gift, gratuity, favor, service, loan . . . fee or compensation or anything of monetary value.

(*Id.* at Ex. 20.)

On May 20, 2010, Ferrari and/or his wife Kimberly Ferrari ("Kimberly") formed Prince 5 Holdings, LLC ("Prince 5"), and on January 18, 2011, they formed P6 Holdings, LLC ("P6"). (Kimberly Dep. at Ex. 1 & 8.) These entities were owned by Ferrari and Kimberly, though exactly which one of them formed, owned, and controlled the funds in the entities is in dispute.

Horton alleges that Ferrari involved Brad Zeitlin ("Zeitlin"), a friend of Ferrari's who did not work for Horton, in land deals in Mississippi even after Whitehurst specifically directed him not to. However, Ferrari claims that Whitehurst told him to get Zeitlin involved in the Mississippi deals, because Whitehurst was afraid of increased competition in the market if Horton's interest in the properties became public knowledge. (Ferrari Dep. at 121-22.) Horton also insists—and Ferrari denies—that Ferrari lied to Horton about Zeitlin's involvement in land deals. However, it is undisputed that Ferrari spoke to Zeitlin and Pete Barton ("Barton"), who worked with Zeitlin, about possible deals for Horton, discussing information about "school district, lot size, building pad size, overall location, restrictive covenants for design guidelines for building homes, potential price range, [as well as] other terms . . . that would have been

relevant, approximate deals, environmental considerations, entitlement, [and] development considerations." (Ferrari Dep. at 131-32.)

Zeitlin conducted business as a member or authorized party through a number of LLCs, including Terra Capital Management ("Terra"), Woodford Advisory, LLC ("Woodford"), New Orchard Advisory, LLC ("Orchard"), Nog Development Services, LLC ("Nog"), Einstein Ventures, LLC ("Einsten"), and TZMZ Holdings, LLC ("TZMZ"). (Zeitlin Dep. at 7-8, 24, 59, 60-1.) These entities would "flip" properties to Horton or DHI by buying the land and then selling it a few hours or days later at a substantially higher price. (Cummings Dep. at Ex. A.) Ferrari denies that Horton could have purchased these properties at a lower price if Zeitlin had not been involved. (Whitehurst at 123, 175.)

While Ferrari was working at Horton, Zeitlin issued several checks amounting to a substantial sum, made payable to Prince 5. (Zeitlin Dep. at 38-52.) Zeitlin testified that the funds were intended to reward Ferrari for introducing him to Horton by giving him a share in the value of his transactions with Horton. Ferrari, however, claims that the funds were "gifts" between friends, and denies that they were kickbacks related to sales of land by Zeitlin to Horton. (Ferrari Dep. at 74.)

P6 also received money from former Horton employee Kenny Smith ("Smith") and Cogent Building Group, allegedly as a "finder's fee" for introducing Smith to Zeitlin, who then allowed Smith to be involved in building houses in Destin, Florida. (Smith Dep. at 44-7.) Further, Prince 5 and P6 sent funds to Zeitlin and Zeitlin-related entities while Ferrari was employed at Horton. (Zeitlin Dep. at 97,101, 105.)

Ferrari claims that Horton CEO David Auld ("Auld") knew about this conduct in 2012 and asked Whitehurst to look into it months before Ferrari was terminated. (Auld Dep. at 10-1, 26.) Thus, Ferrari claims, Horton did not take action based on the reports of misconduct until after Ferrari complained to Whitehurst about sexual harassment. However, Horton provides testimony that the 2012 investigation did not result in any finding of misconduct, and argues that this was because of Ferrari's concealment of his actions.  Horton maintains that immediately after receiving more reports about Ferrari's alleged fraud, it initiated an investigation, beginning with a meeting between Whitehurst and Horton representatives Paula Hunter-Perkins ("Perkins") and Rachel Dequattro ("Dequattro") on July 9, 2013. (*Id.* at 45-7, Ex. 2, Dequattro Dep. at 20.) Even then, Ferrari, who was present at the meeting, did not disclose the

payments from Zeitlin-related entities to Prince 5 and P6. (Ferrari Dep. at 94-5.)

After this meeting, on July 9 or 10, 2013, Ferrari was suspended and was subsequently terminated on July 31, 2013, based on a joint decision by Whitehurst, Auld, Perkins, and Mike Shetterly, Horton's attorney. (Ferrari Dep. at 206-07.) Horton claims that Ferrari was terminated because  of "failure to follow clear instruction[,]. . .  conflict of interest[,]. . . false information provided in an investigation[,]. . . refu[sal] to cooperate with investigation[, and] . . . insubordination." (Whitehurst Dec. Ex. D.)  However, Ferrari claims that he was never informed about "the precise nature of any allegations against him." (Doc. 180 at 10-11.)

B. Alleged Sexual Harassment

Ferrari alleges that he suffered sexual harassment while employed at Horton, in the form of the following conduct:

1) Ferrari received a January 23, 2010 email from Jeff Dequattro—Dequattro's then-husband, who was not a Horton employee—which contained a picture of Dequattro riding a mechanical bull. (Ferrari Dep. at 190-93, Ex. 21.)

2) Ferrari received a February 12, 2012 email from Jeff A. Marzello—one of Ferrari's subordinates—stating "I also want a blow job from Paris Hilton." (Def. Ex. 22.)

3) Ferrari received a November 27, 2012 email from Dequattro in which she said "I will f-----g REMEMBER to do this." (*Id.*)

4) Ferrari received a November 28, 2012 email from Dequattro which stated "[Aww!] I needed that, my head is about to explode." This email was in response to Ferrari's email which said "You're the terminator." (*Id.*)

5) Ferrari received a December 12, 2012 email and a March 14, 2013 email from Dequattro in which she said "Love ya." (*Id.*)

6) Ferrari received a May 22, 2013 email from Shane H. Ikerman ("Ikerman") in which he said "lol B---h." This email was a reply to Ferrari's email which stated "Neeener neeeener neeeener." (*Id.*)

7) Ferrari received a May 30, 2013 email from Dequattro in which she called him "dear." (*Id.*)

8) Ferrari received an email from Dequattro with a picture of a man in his underwear and a comment about the picture. (Ferrari Dep. at 114-15.)

9) Ferrari received an email from Dequattro with a link to a "Mormon sex site or something like that." (*Id.*)

10) Ferrari was subjected to Will Moody's ("Moody") "insinuations that [Ferrari] was a homosexual, his putting up on [Ferrari's] cork board in [Ferrari's] office a picture of a little Chihuahua with big testicles in order to embarrass [Ferrari] in the company, [Moody's] pictures that he would forward to colleague's phones . . . that insulted [Ferrari] for [his] height." (*Id.* at 106.) This incident allegedly occurred on March 31, 2012. (Def. Ex. 19 at P0181.)

11) Ferrari was subjected to conversations in which Dequattro "corner[ed] [Ferrari] in [his] office on multiple occasions and . . . graphically describe[d] such things as her breast augmentation and rub[bed] her body so as to illustrate to [Ferrari] where incisions were made, where bruising occurred, what complications she had . . . as she was fondling herself to illustrate." (Ferrari Dep. at 198.) At least one of these incidents occurred on July 15, 2010. (Def. Ex. 19 at P0174.)

12) Ferrari witnessed Auld rubbing Dequattro's shoulders at a business dinner and Dequattro subsequently discussed it with Ferrari, asking if "it look[ed] like [she] was giving David BJs to get a promotion."

(Ferrari Dep. at 117-18.) Horton provides email evidence that this dinner occurred on February 17, 2010. (Whitehurst Dec. Ex. G.)

13) Ferrari witnessed Dequattro's discussions about "how she taught her daughter . . . how to give oral sex replete with hand gestures and mouth gestures," and "her preference for anal sex," and how "it offended her sensibilities that after anal sex [a boyfriend] wanted her to give him oral sex." (Ferrari Dep. at 198-99.)

14) Ferrari witnessed Dequattro and Cassie Kropp ("Kropp"), who was another Horton employee, discussing "the fact that Scott [Whitehurst] has a small penis, [his wife] does not like to have sex with him and he is a one minute wonder." (*Id.* at 199.)

15) Ferrari witnessed Ikerman's recounting of conversations with Dequattro about "her need, her want for certain male body parts." (*Id.* at 199-200.)

16) Ferrari was subjected to Dequattro's showing him and Whitehurst an image of "a broken shower glass where her daughter had broken the glass . . . from having sex with her boyfriend," and Whitehurst "trac[ing] the outline of [the daughter's] backside on the shower glass and ma[king] a disgusting comment about it." (*Id.* at 200.)

17) Ferrari was subjected to Kropp's "touching [him] inappropriately with great frequency, lifting [his] shirt, using the nature of the cloth of [his] shirt to touch [his] arms, describing discussions . . . with . . . Dequattro about [him] in compromised situations," and "cornering [Ferrari] . . . and telling [him] that she wanted to have sexual relations with [him] . . . with [his] wife in earshot." (*Id.* at 200-01.)

18) Ferrari was subjected to Kropp's commenting about her sexual habits, including "descriptions of her body when she was teaching aerobics and what she could do with that body, descriptions . . . of her hysterectomy and what it did to her private parts . . . [and] of sexual relations she had with someone in a wheelchair." (*Id.* at 201.)

19) Ferrari was subjected to Ikerman's inappropriate conduct, including "telling [Ferrari] that [he] needed to obtain sexual favors from [his] wife," on August 12, 2010, "[m]aking overtly sexual movements against female colleagues in [his] presence" on April 24, 2010, and "showing [Ferrari] emails from his D.R. Horton email where he was asking his wife for sexual favors" on May 25, 2011. (*Id.*, Def. Ex. 19 at P0173, 175, 180.)

20) Ferrari witnessed Whitehurst's vulgar statements during management meetings, including explaining a vulgar act, discussing gonorrhea, and using frequent profanity with sexual meanings. (Ferrari Dep. at 202-03.)   At least some of these comments occurred at a January 18, 2012 meeting. (Def. Ex. 19. at P0181.)

21) Ferrari witnessed Whitehurst stating "what HR, there is no HR." (Ferrari Dep. at 202-03.)

22) Ferrari witnessed discussions by D.R. Horton employees Auld and Don Tomnitz ("Tomnitz") at a business dinner "about how their wives would not have sexual relations with them . . . [and] the fact that [they] had to have their needs serviced elsewhere." (*Id.* at 196.) Horton presents email evidence that this dinner took place February 7 or 8, 2012. (Dequattro Dec. Ex. B.)

23) Ferrari was subjected to Horton employee Donnie Long's showing him a pornographic video at a Horton event in 2010 or 2011. According to Ikerman, when he spoke to Ferrari about the video, Ferrari "said that the video was gross, and [] was laughing about it, and [] told [him] that [he] needed to go see it." (Ikerman Dep. at 22-3.) Ikerman further states that when he asked Ferrari if he was

okay, Ferrari said "yes, just remind me not to watch anything on Donnie's phone again." (*Id*).

However, despite this environment, Ferrari admits he never filed a report with Horton or DHI's Human Resources Department, did not call the anonymous hotline that Horton provided, did not respond to any of the emails with a complaint about their profane content, and did not ever tell anyone to stop behaving in such a manner. (Ferrari Dep. at 112-13.) Instead, he replied to some emails, which he claims were "harassing," with comments such as "ha ha ha" or "LMAO." (*Id*. at 112.) Further, when Ferrari met with Whitehurst, Perkins and Dequattro on July 9, 2013, he did not tell Perkins, who was the Vice President of Human Resources, about the conduct. (*Id*. at 108.)

Yet, Ferrari charges that his colleagues should have known he was displeased with the "harassing" conduct because he reacted by "virtually wincing, turning and walking away, ignoring the person who was speaking, [and] coming back at a later time." (*Id*. at 204.) He insists that these were some of the "many indications given . . . to illustrate [his] discomfort," and that he "complained verbally" to Dequattro on an unspecified date, Ikerman on May 22, 2013, and Whitehurst in February-May 2013. (*Id*. at 204, 348-49, Def. Ex. 19 at P0169, Pl. Ex. 4 at 4-6.)

On January 27, 2010, Ferrari sent an email to prospective real estate developer Nathan Cox ("Cox") which included insults, profanity, sexual references, and a threating reference about "breaking [individuals] like [Cox] over [his] knee." (*Id.* at 99, Ex. 5.) He also made a comment about "cracking Will Moody's head like a [f-----g] coconut," and when questioned about that e-mail, admitted that "[a] profane word is not necessarily adult content which is not necessarily sexual . . . harassment." (*Id.* at 113.) Ferrari was disciplined for sending this email.

Ferrari filed an EEOC charge of discrimination on January 23, 2014—almost six months after his termination from Horton on July 31, 2013—alleging retaliation for his verbal complaints about sexual harassment. (Doc. 1 Ex. 2.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the nonmoving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citations omitted). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

III.   DISCUSSION

A. Horton's Standing to Bring Counterclaims

As an initial matter, Ferrari moved for summary judgment on all claims based on deals for land in Florida, alleging that Horton "is not the

proper party, has no standing, and cannot state a cause of action as to Florida transactions" because Horton "is legally prohibited from disregarding the corporate existence of DHI and treating DHI's purported damages as its own." (Doc. 173 at 7.) Ferrari bases this argument on the undisputed fact that Horton did not operate in Florida and that Horton and DHI allocated Ferrari's compensation internally. According to Ferrari, since Horton did not operate in Florida, he is liable only to DHI for his actions related to land in Florida. However, Ferrari does not dispute that he received all his compensation from Horton and was employed solely by Horton, even while he was involved in the Florida transactions. Horton alleges that Ferrari is liable for conduct that violated the duties of the employment contract he had with Horton even if some of the damages were suffered by DHI, a separate entity.

Whether a party has standing is a procedural question, which will be answered by referencing federal law. *See E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 984 (11th Cir. 1990). In order to have standing to bring a claim in federal court, a plaintiff must show that (1) it suffered an injury in fact (2) the injury is traceable to the challenged conduct of the defendant and (3) the injury will likely be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Court is

concerned that Horton may not have standing to recover some of the damages it seems to claim. However, Horton does have standing to assert that Ferrari breached his employment contract, because such a breach would injure Horton. Neither party cited the Court to law or facts that would sufficiently demonstrate which of Horton's claims are due to be dismissed at this stage based on the lack of standing. Therefore, viewed in the light most favorable to the non-movant, this issue must be determined at trial. Summary judgment based on a lack of standing is due to be denied.

### B. Horton's Counterclaim Damages

Ferrari moved for summary judgment based on his contention that Horton has failed to sufficiently prove damages for its counterclaims. This argument appears to be based on Horton not presenting evidence of a calculation of the amount of damages. However, under Alabama law, Horton does not need to provide evidence of a specific amount of damages in order to survive summary judgment. Instead, Horton simply needs to "establish the existence of damages as a result of the alleged breach." *Jones v. Hamilton*, 53 So. 3d 134, 142 (Ala. Civ. App. 2010). Horton does provide evidence of the sources of the purported damages, including the pay Ferrari received while employed at Horton, the alleged

kickbacks Ferrari received from Zeitlin, and the increased cost that Horton incurred from Zeitlin's involvement in land deals. Viewed in the light most favorable to the non-movant, the fact that there were damages has been shown, and the question of the amount of such damages is for the jury. Summary judgment is not due to be granted on this issue.

### C. Horton's Counter Claim for Breach of Fiduciary Duty and the Duty of Loyalty

Horton and Ferrari both moved for summary judgment on Horton's counterclaim against Ferrari for breach of fiduciary duty and breach of the duty of loyalty. Ferrari argues that Horton cannot bring a state law claim for breach of fiduciary duties because such claims are preempted by the ATSA. The Alabama Supreme Court has held that "the legislature intended for the [ATSA] to replace common law tort remedies for the misappropriation of trade secrets." *Allied Supply Co. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991).  Yet, Horton's claims are not solely based on "misappropriation of trade secrets." Horton also alleges that Ferrari took money from Zeitlin in exchange for giving him priority on deals, that Ferrari lied to Horton, that Ferrari refused to cooperate in Horton's investigation of his conduct, that Ferrari personally invested in land deals with Zeitlin, and that Ferrari was disloyal to Horton in other ways.

Therefore, while some of Horton's claim for breach of the duty of loyalty may be preempted, it is not entirely preempted by the ATSA.

In order to prove breach of fiduciary duty under Alabama state law, a plaintiff must show "(1) the existence of a fiduciary duty between the parties; (2) the breach of that duty; and (3) damages suffered as a result of the breach." *Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012). An agent owes his principal the duty "to act, in all circumstances, with due regard for the interests of its principal, and to act with the utmost good faith and loyalty." *Allied Supply Co.,* 585 So. 2d at 37. Ferrari, as Horton's employee with the above described responsibilities, was its agent. *See Sawyer v. Chevron U.S.A., Inc.*, 421 So. 2d 1263, 1264 (Ala. 1982).

Horton points to payments from Zeitlin to the Ferrari entities to bolster its claims that Ferrari violated this duty by "providing Zeitlin with preferential treatment in exchange for kickbacks." (Doc. 163 at 29.) However, Ferrari denies these allegations, proffering—among other evidence—Zeitlin's testimony that the payments were not tied to particular transactions, his own testimony that Whitehurst directed him to involve Zeitlin in transactions, and the fact that he did not have the

authority to give anyone such treatment. There being disputed issues of fact, summary judgment as to this claim is due to be denied.

### D. Horton's Faithless Servant Counterclaim

Horton and Ferrari both move for summary judgment on Horton's faithless servant counterclaim against Ferrari. Alabama's faithless servant doctrine "precludes an employee from receiving compensation for conduct that is disloyal to the employer or in violation of the employee's employment contract." *Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 209 (Ala. 2007). In *Edwards*, the court held that if the employee was found to have violated his duty of loyalty to his employer, he would also be found to be a faithless servant. *Id.* at 210-11. Here, as explained above, Ferrari's breach of the duty of loyalty is a question for the jury. Though faithless servant claims can also be brought for conduct that violates an employment contract, Horton does not argue that Ferrari incurred faithless servant liability by violating his employment contract. *See Id.* at 209. Horton does allege that Ferrari's conduct breached the rules set forth in the handbook, but does not present any evidence that in doing so, Ferrari violated his contract. However, because a reasonable jury could find either that Ferrari was a faithless servant or was not a

faithless servant, the question is for the jury to determine, and summary judgment on this claim is due to be denied.

### E. Horton's Unjust Enrichment Counterclaim

Horton and Ferrari moved for summary judgment on Horton's counterclaims for unjust enrichment against Ferrari. In order to prevail on a claim for unjust enrichment, Horton must show that "[Ferrari] holds money, which, in equity and good conscience, belongs to [Horton] or holds money which was improperly paid to [Ferrari] because of mistake or fraud." *Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986). Horton alleges that Ferrari is liable under a theory of unjust enrichment because Ferrari received compensation from Zeitlin for deceiving Horton and involving Zeitlin in land deals. However, Ferrari and Zeitlin both deny that the funds Ferrari received from Zeitlin were related to any preferential treatment, and Ferrari testifies that Zeitlin never made those statements, that Ferrari only did what Whitehurst commanded, and that Ferrari did not have the authority to give Zeitlin preferential treatment. A reasonable jury could find that Ferrari was not unjustly enriched at Horton's expense. Therefore, summary judgment as to Horton's claim for unjust enrichment is due to be denied.

### F. Horton's Counterclaim Under the ATSA

Ferrari moved for summary judgment on Horton's claim against Ferrari under the ATSA. The ATSA "provides for the recovery of 'actual damages' suffered as a result of a 'misappropriation' of a trade secret." *Systrends, Inc. v. Grp. 8760, LLC.*, 959 So. 2d 1052, 1065 (Ala. 2006) (quoting Ala. Code § 8-27-4). Misappropriation has occurred if:

> (1) That person discovered the trade secret by improper means; (2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other; (3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2), above; or (4) That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake."

Ala. Code § 8-27-3. The trade secrets that Horton alleges Ferrari shared with Zeitlin are the targets for land purchases and their prices. Ferrari does not dispute that he shared some of this information with Zeitlin. However, he provides evidence that Horton directed him to do so, because it wanted to have Zeitlin purchase land for Horton quietly. If Horton directed Ferrari to share the information, there would be no misappropriation. Ferrari would have learned about the information from proper means and would not have breached Horton's confidence in disclosing it. Because a reasonable jury could find that Ferrari shared

information at Horton's direction, summary judgment as to Horton's ATSA claim is due to be denied.

### G. Ferrari's Claim for Title VII Retaliation

Horton moved for summary judgment on Ferrari's claim against Horton for Title VII retaliation. The Eleventh Circuit analyzes Title VII retaliation claims usings the burden-shifting scheme first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason[]" for its actions. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). If the defendant produces evidence of a legitimate reason, "the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual." *Id.* The plaintiff's burden to establish pretext applies to all of the defendant's proffered reasons. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). Thus, when a defendant proffers more than one reason, a plaintiff fails to meet this prong if he does not establish pretext as to each of those reasons. *Id.*

In order to establish "[a] prima facie case of retaliation under Title VII . . . the plaintiff [must] show that: (1) [he] engaged in an activity

protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Under Title VII, "an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'" *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. § 2000e-3(a)). This opposition does not have to be a "formal complaint," but must "explicitly or implicitly communicate [ ] a belief that the practice constitutes unlawful employment discrimination." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (quoting EEOC Compl. Man. (CCH) § 8-11-B(2) (2006)). Here, Ferrari claims that he made an "internal complaint[] of sexual harassment to superiors," which is sufficient to constitute protected activity for a prima facie case of retaliation. *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001). Further, Ferrari was terminated, which is an adverse employment action. *See Crawford*, 29 F.3d at 970.

The causal connection between the protected activity and the adverse employment action requires "but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). This burden can typically "be

met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000)). Here, Ferrari testifies that he verbally complained to Whitehurst about the alleged sexual harassment from February to May of 2013. He was suspended on July 9 or 10, 2013 and terminated on July 31, 2013. Therefore, Ferrari was terminated about two months after his last complaint to Whitehurst about sexual harassment.

The Eleventh Circuit has ruled that a one-month gap is sufficiently close to establish causation by itself, but a three month period is not. *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (period of one month between protected activity and adverse employment action is enough to show causation). However, Ferrari has also provided evidence that Horton had received complaints about the very same conduct made the basis of his termination as early as 2012, but did not act on such complaints until after Ferrari complained about sexual harassment. Therefore, the Court

will assume, *arguendo*, that Ferrari has established a causal connection and thus a prima facie case of retaliation.

The burden then shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason[]" for its actions. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). However, the burden does not require "[t]he defendant . . . [to] persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Instead, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* Here, Horton alleges it terminated Ferrari for "failure to follow clear instruction[,]. . . conflict of interest[,]. . . false information provided in an investigation[,]. . . refu[sal] to cooperate with investigation[, and] . . . insubordination." (Whitehurst Dec. Ex. D.)

Therefore, "the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual." *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1331 (11th Cir. 1998). An employee can do this "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256.  However, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on, and rebut it, and that employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

Therefore, if "a plaintiff chooses to attack the veracity of the employer's proffered reason, '[the] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1310-11 (11th Cir. 2012) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Further, "[t]he district court must . . . determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1516, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

Ferrari alleges that Horton's failure to inform him about the exact reason for his termination and the results of its internal investigation is

evidence of pretext. He also alleges that Horton's reasons for termination were impermissibly vague and show pretext because Horton failed to explain which of Ferrari's conduct fits into the categories of "failure to follow clear instruction, conflict of interest, false information provided in an investigation, refusal to cooperate with an investigation, and insubordination." (Doc. 180 at 12-13.) *See Stamey v. S. Bell Tel. & Tel. Co.*, 859 F.2d 855, 862 (11th Cir. 1988) ("vague" reasons are not enough to rebut prima facie case).

Lastly, Ferrari alleges that pretext is shown by the timing of Ferrari's termination, because, according to Ferrari, Horton had received complaints about Ferrari's alleged conflicts of interest as early as 2012, but did not choose to act upon the complaints until after Ferrari complained about sexual harassment. Horton explains that it did investigate these complaints, but took no action against Ferrari until July 2013 because it was unable to find any evidence of Ferrari's misconduct until it conducted an investigation in June and July 2013. A reasonable jury could conclude that Horton failed to investigate these complaints rigorously at an earlier date because Horton was not truly concerned about them. *See Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 831 (11th Cir. 2000). Therefore, viewed in the light most favorable to

Ferrari, the facts alleged "could allow a jury to find by preponderance of the evidence that [he] has established pretext." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993). Summary judgment as to Ferrari's Title VII retaliation claims is due to be denied.

### H. Ferrari's Claim for Intentional Infliction of Emotional Distress/Outrage

Ferrari claims intentional infliction of emotional distress/outrage based on the alleged sexual harassment that he suffered. Horton moved for summary judgment on this claim. In Alabama, the torts of intentional infliction of emotional distress and outrage are synonymous. *Ex parte Crawford & Co.*, 693 So. 2d 458, 460 (Ala. 1997). To bring a successful action for outrage, a "plaintiff must prove (1) that the defendant's conduct was intentional or reckless; (2) that it was extreme and outrageous; and (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* The tort is limited to particularly serious situations, including "egregious sexual harassment." *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011). It does not permit actions for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012).

The statutory period of limitation for the tort of outrage is two years. *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1215 (Ala. 1990). Ferrari argues that the conduct was a "continuing violation" and that the Court should adopt a "hostile work environment" theory from Title VII jurisprudence, which would allow all of the conduct to be considered as one action for limitations purposes. (Doc. 180 at 21-22.) However, Ferrari provides no support for such an adoption in Alabama case law. Further, a "continuing tort" argument in a similar case has already been made before the Alabama Supreme Court, which rejected the argument and held that an action for conduct outside of the two-year limitations period was time-barred. *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 888 (Ala. 1995). Ferrari filed the instant action on October 10, 2014. Therefore, any claims arising from actions that took place before October 10, 2012 are time-barred and will not be considered by the Court.

Ferrari's own electronic journal places most of the conduct as occurring before October 2012. The allegedly harassing events that occurred after that date are the following:

1) Ferrari received a November 27, 2012 email from Dequattro in which she said "I will f-----g REMEMBER to do this." (*Id.*)

2) Ferrari received a November 28, 2012 email from Dequattro which stated "[Aww!] I needed that, my head is about to explode." This email was in response to Ferrari's email which said "You're the terminator." (*Id.*)

3) Ferrari received a December 12, 2012 email and a March 14, 2013 email from Dequattro in which she said "Love ya." (*Id.*)

4) Ferrari received a May 22, 2013 email from Shane H. Ikerman ("Ikerman") in which he said "lol B---h." This email was a reply to Ferrari's email which stated "Neeener neeeener neeeener." (*Id.*)

5) Ferrari received a May 30, 2013 email from Dequattro in which she called him "dear." (*Id.*)

Ferrari does not provide a date for the following allegedly harassing events:

1) Ferrari received an email from Dequattro with a picture of a man in his underwear and a comment about the picture. (Ferrari Dep. at 114-15.)

2) Ferrari received an email from Dequattro with a link to a "Mormon sex site or something like that." (*Id.*)

3) Ferrari witnessed Dequattro's discussions about "how she taught her daughter . . . how to give oral sex replete with hand gestures

and mouth gestures," and "her preference for anal sex," and how "it offended her sensibilities that after anal sex [a boyfriend] wanted her to give him oral sex." (Ferrari Dep. at 198-99.)

4) Ferrari witnessed Dequattro and Kropp discussing "the fact that Scott [Whitehurst] has a small penis, [his wife] does not like to have sex with him and he is a one minute wonder." (*Id.* at 199.)

5) Ferrari witnessed Ikerman's recounting of conversations with Dequattro about "her need, her want for certain male body parts." (*Id.* at 199-200.)

6) Ferrari was subjected to Dequattro's showing him and Whitehurst an image of "a broken shower glass where her daughter had broken the glass . . . from having sex with her boyfriend," and Whitehurst "trac[ing] the outline of [the daughter's] backside on the shower glass and ma[king] a disgusting comment about it." (*Id.* at 200.)

7) Ferrari was subjected to Kropp's "touching [him] inappropriately with great frequency, lifting [his] shirt, using the nature of the cloth of [his] shirt to touch [his] arms, describing discussions . . . with . . . Dequattro about [him] in compromised situations," and "cornering [Ferrari] . . . and telling [him] that she wanted to have

sexual relations with [him] . . . with [his] wife in earshot." (*Id.* at 200-01.)

8) Ferrari was subjected to Kropp's commenting about her sexual habits, including "descriptions of her body when she was teaching aerobics and what she could do with that body, descriptions . . . of her hysterectomy and what it did to her private parts . . . [and] of sexual relations she had with someone in a wheelchair." (*Id.* at 201.)

9) Ferrari witnessed Whitehurst's stating "what HR, there is no HR." (Ferrari Dep. at 202-03.)

Ferrari also alleges that there were other propositions and inappropriate emails similar to those described above.

None of the above instances, taken singly or together, amount to cognizable outrage under Alabama law. Solicitations for an extra-marital affair, such as those Kropp purportedly directed at Ferrari, "do not constitute outrageous conduct." *Perkins v. Dean*, 570 So. 2d 1217, 1219 (Ala. 1990). Yet, the Alabama Supreme Court held that victims of sexual assault have cognizable claims for the tort of outrage. *Harrelson v. R.J.*, 882 So. 2d 317, 321 (Ala. 2003). A plaintiff could also make out a claim for outrage when her supervisor made sexual comments to her and then

"grabbed her by the wrist, pulled her into his lap, and began rubbing her tights." *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 983 (Ala. 1999). In *Busby v. Truswal Systems Corp.*, the court allowed a claim for outrage when the plaintiffs showed that the defendant had made sexual comments to the plaintiffs, tried to follow one of the plaintiffs into the restroom, stared at a plaintiff's genitals, and "put his arm around the plaintiffs, grabbed their arms, and stroked their necks." 551 So. 2d 322, 324 (Ala. 1989). In *Henry v. Georgia-Pacific Corp.*, an employer required the plaintiff to continue to attend counseling sessions after a counselor made sexual comments during sessions and once asked the plaintiff to take off her shirt. 730 So. 2d 119 (Ala. 1998). The Alabama Supreme Court held that "[a] jury could reasonably determine that [the defendants'] conduct was outrageous" because "[the employer], with prior knowledge, required [the plaintiff] to continue counseling sessions at which improper sexual conduct was occurring." *Id.* at 121.

Viewing the evidence in the light most favorable to the non-movant, Ferrari fails to allege any conduct that amounts to the severity required to make out a claim for outrage. Thus, summary judgment is due to be granted in Horton's favor as to Ferrari's claim for outrage.

I.  Ferrari's Claim for Invasion of Privacy

Horton moves for summary judgment on Ferrari's state law claim for invasion of privacy. In order to establish a "claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1195 (Ala. 1998). "Extensive inquiries into one's sex life . . . may constitute an invasion of privacy." *Id.* at 1194.

However, the Alabama Supreme Court has only found viable claims for invasion of privacy based on sexual harassment in a few cases. The facts in these cases involved egregious sexual conduct. In *Atmore Community Hospital*, the defendant made sexual comments, "asked [the plaintiff] to meet him outside of work hours for other than business purposes," and "looked up her skirt." 719 So. 2d at 1195. In *Phillips v. Smalley Maintenance Services, Inc.*, the plaintiff testified that the defendant inquired into her sexual relationship with her husband, asked her for oral sex repeatedly, and "struck her across the buttocks with his hand." 435 So.2d 705, 711 (Ala. 1983). In *Busby*, a supervisor made various lewd

comments and gestures about the plaintiffs, "acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands," tried to enter the restroom with plaintiffs, followed the plaintiffs, and "put his arm around the plaintiffs, grabbed their arms, and stroked their necks." *Busby*, 551 So. 2d at 324.

Ferrari has not shown the existence of facts that are severe enough to make out a claim for invasion of privacy. Most of Ferrari's allegations involve sexual comments, often about other individuals, and none of the sexual gestures involved Ferrari's body. Ferrari does allege that comments were made about his sex life and that Kropp touched his arms and lifted his shirt. However, unlike *Busby*—where the incident of arm-touching was accompanied by other touches, sexual comments about the plaintiffs, following the plaintiffs, and threatening gestures—Ferrari does not present evidence of other egregious conduct directed at his person. Therefore, viewing the evidence in the light most favorable to the non-movant, Ferrari has failed to establish that Horton's conduct was "offensive or objectionable" enough "that a reasonable person subjected to it would experience outrage." *Atmore Cmty. Hosp.*, 719 So. 2d at 1195. Summary judgment in Horton's favor is due to be granted on Ferrari's claim for invasion of privacy.

### J. Ferrari's Claim for Negligent and Wanton Supervision, Hiring and Retention

Horton moved for summary judgment on Ferrari's claim against Horton for negligent and wanton supervision, hiring, and retention. In order to state this claim, a plaintiff must show "by affirmative proof that [a servant's] incompetency was actually known by the master, or that had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001); *see Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 305 (Ala. 2010). Here, Ferrari alleges that Horton knew about the allegedly harassing conduct through various "verbal" reports that Ferrari made to management. However, Ferrari must also show "that the allegedly incompetent employee committed . . . [a] tort." *Jones Exp.*, 86 So. 3d at 304 (quoting *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)). As discussed above, Ferrari cannot show that Horton's employees committed the torts of outrage or invasion of privacy. Ferrari also has not argued or provided any evidence that Horton's employees committed another underlying tort. Therefore, viewing the evidence in the light most favorable to the non-movant, Ferrari cannot make out a claim for

negligent or wanton supervision, hiring, and retention. Summary judgment in Horton's favor is due to be granted as to this claim.

## IV.   CONCLUSION

For the reasons stated above, Ferrari's motion for summary judgment is due to be DENIED.[2] Horton's motion for summary judgment is due to be GRANTED in part and DENIED in part. Summary judgment is due to be granted in Horton's favor as to Ferrari's claims for outrage, invasion of privacy, and negligent or wanton supervision, hiring and retention. Summary judgment as to all other claims is due to be denied. Further, Horton's Motions to Strike (Doc. 188 and 190) are DENIED AS MOOT. A separate order consistent with this opinion will be entered.

**DONE** and **ORDERED** this 3rd day of February 2017.

_____
L. Scott Coogler
United States District Judge

186291

---

[2] Ferrari moved for summary judgment on all of Horton's counterclaims against him. However, he failed to mention Horton's claims for fraud through misrepresentation of material fact under Ala. Code § 6-5-101, fraud through suppression of material facts under Ala. Code § 6-5-102, fraudulent deceit under Ala. Code § 6-5-104, and intentional interference with prospective economic advantage. Therefore, the Court will interpret Ferrari's motion as not moving for summary judgment on those claims. As such, those counterclaims will proceed to trial.